Welch, J.
INTRODUCTION
This case involves a venerable statute, dating from 1892, and its application against a modern backdrop. Near the end of the nineteenth century, the Massachusetts legislature authorized cities and towns to charge “just and equitable” rates for the use of the municipal sewers. M.G.L.c. 83, §16. Despite protests that the assessed rates constituted illegal taxes or deprivations of property, the Supreme Judicial Court and the United States Supreme Court upheld the statute. Carson v. Brockton, 175 Mass. 242, aff'd, 182 U.S. 398 (1900). It was a simpler time. Environmental regulation was essentially nonexistent and sewer rates were relatively modest. Over the course of a century, things have changed. No longer do cities merely collect and centralize the disposal of municipal sewage. Instead, federal and state law now require advanced treatment of household and industrial waste water. In the late twentieth century, the cost of treating industrial and household sewage (including the cost of building or maintaining municipal sewage treatment plants) has risen dramatically due to stringent environmental laws coupled with increasingly scarce resources. Confronted with the need to raise revenue to pay the cost of advanced waste water treatment, municipalities throughout Massachusetts — and the nation — have developed varying strategies and sewer rate structures. This case focuses on the City of Lawrence’s recent attempt to struggle with this difficult, complex — and, at times, politically explosive — issue.
The plaintiff Merrimac Paper Company is a paper manufacturing company located in Lawrence that discharges its waste water into the municipal sewers. The City of Lawrence recently adopted a “two-tier” sewer rate that raised the rate for those individuals who discharge large amounts of waste water. Merrimac Paper claims that Lawrence’s recently adopted sewer rates violate the Massachusetts Constitution and M.G.L.c. 83, §16 in that the rates constitute illegal *361 taxes and are not “just and equitable” to industries that discharge large quantities of waste water.[1]
FACTS
After considering the testimony, reviewing the stipulated exhibits (totaling in excess of 79 in number) and considering the stipulated facts, this court makes the following findings of fact.
The City of Lawrence, like many old industrial cities, long has maintained what is called a “combined” sewer system. This combined system collects and transports storm water and sanitary waste water to a treatment facility. The City of Lawrence only collects and transports this waste water and does not treat the waste water. Instead, the waste water is transported to and treated at the Greater Lawrence Sanitary District (“GLSD”). The GLSD treats the waste water before discharging it into the Merrimac River. The GLSD then bills the City of Lawrence and the other communities within the Greater Lawrence Sanitary District (these include the City of Methuen and the Towns of North Andover and Andover and Salem, New Hampshire). The City of Lawrence is the heaviest user of the GLSD treatment facility, contributing approximately half of the total amount of waste water to the GLSD. In turn, GLSD charges the City of Lawrence a hefty assessment for the waste water it contributes to the treatment plant. For example, the GLSD was expected to charge the City of Lawrence and excess of six million dollars for each fiscal year from 1994 onward. See Exhibit 3 (Exhibit A attached thereto). In addition, the City of Lawrence also must pay for its own sewer operations (e.g. maintaining its own sewer pipes and paying for sewer personnel).
One of the major expenses for Lawrence, and any city with an older “combined” sewer system, is the treatment of so-called “infiltration and inflow.” This phrase refers to the storm water, ground water, and other non-waste water that flows into or infiltrates the city’s sewer collection system. Other than storm water runoff, examples of infiltration and inflow include poor connections with or within the city’s sewer line that permits ground water to leak into the sewer. Thus, it is not only sanitary or industrial waste that is being transported to the treatment plant for processing, but also storm and ground water. This infiltration and inflow presently accounts for almost fifty percent of Lawrence’s total waste water. The city does not attempt to assess each sewer user a separate charge for the cost of treating infiltration or inflow.[2]
By at least 1991, it was apparent that the sewer rates being charged by the City of Lawrence to the users of the City of Lawrence sewer system were not adequately compensating for the costs that the City of Lawrence was incurring in operating its sewers and paying the GLSD yearly assessment. The sewer use rate at that time was set by the City of Lawrence at $1.40 per hundred cubic feet (ccf). This rate was uniform to all users of the city sewer and did notvary according to the amount of waste water discharged into the system.
It was apparent to the sewer commission or the City of Lawrence that the rate had to be increased in order to compensate for the past under-funding of the sewage treatment services. For example, the City of Lawrence had a short fall of at least $600,000 for the 1992 GLSD assessment.[3]
In order to develop an increased rate structure, the City of Lawrence decided to hire the established and experienced engineering firm of Whitman and Howard. Whitman and Howard undertook to develop a new proposed rate structure of the city. The engineering/consulting firm of Whitman and Howard advised that the City of Lawrence develop a “two-tier” rate, namely a rate that charged a lower rate per hundred cubic feet (“ccf j for waste water below a certain cut off amount and a higher rate for amounts of waste water discharged above that designated level. In the initial draft report submitted by Whitman and Howard in June, 1992 (Exhibit 2) the firm recommended a rate of $1.85 per ccf for users contributing from zero to 550 ccf per year and an increase to $2.52 per ccf for any flows above an annual 550 ccf rate. This rate, which is termed an “inverted block rate” because it has a unit cost which increases with the amount of use, was modified in later drafts submitted by Whitman and Howard. Eventually, Whitman and Howard recommended a two-tier rate which charged customers $1.40 ccf for waste water under 575 ccf per annum and approximately $2.60 ccf for waste water exceeding 575 ccf per annum.
Whitman and Howard revised its figures after consulting with city officials and following their directive that the sewer rate increase must be sufficient to raise approximately $609,000 in reyenue. This figure did not relate to the expenses of sewage transportation and treatment. Instead the $609,000 figure was the projected amount of the City’s FY 1993 budget shortfall. See City Council Minutes, Exhibits 8. See also Exhibits 9 & 10. To be more specific, in September of 1992 the Lawrence City Council adopted a motion to eliminate the $609,360 deficit in the City’s overall fiscal year 1993 budget by increasing the sewer user fee for high capacity users of the system. The city instructed Whitman and Howard to develop a new sewer fee structure that would obtain this $609,360 in sewer revenue for fiscal year 1993 from persons who produce more than 575 ccf ofwaste water. In response, Whitman and Howard proposed a rate of $2.04 for waste water amounts in excess of 575 ccf per year, retaining the $1.40 per ccf rate for volumes of waste water below 575 per year. Eventually, after additional calculation and consideration, the sewer commissioner recommended a rate of $2.61 for volumes of waste water in excess of 575 ccf per quarter, while retaining the $1.40 rate for volumes of waste water below 575 ccf per quarter. This rate was adopted on December 1, 1992. See Exhibit 15.
Setting the “second tier” at a level of 575 ccf per quarter has the effect of charging the higher $2.61 rate *362 only to the largest industrial and commercial producers of waste water. The number of businesses in this category varies each quarter, although the plaintiff consistently discharges in excess of 575 ccf per quarter. No residential customer is included in the second tier. For example, the average single-family residence produces approximately 90 ccf per year of waste water.
The one other city which is part of the GLSD (Methuen) also has an inverted block rate. Methuen charges $1.98 for waste water amounts ranging from zero to 150 ccf and $3.50 for amounts over 150 ccf. Methuen’s two-tier structure also appears to exempt single-family residences from the higher rate tier. The other towns that comprise the GLSD charge a uniform rate (ranging from $2.10 in Andover to $2.95 in Salem, New Hampshire).[4]
The sewer fee structure adopted by the City of Lawrence as of December 1, 1992, does increase revenue for the City of Lawrence and permits it to pay the GLSD assessments and the costs of maintaining its own sewer lines. The increased rate structure, however, will not generate sufficient revenues to meet all the projected sewage treatment expenses. See Exhibit 79, table 9. Although it is difficult to project the future assessments that GLSD will charge the City of Lawrence (due to the decreasing amount of waste water that the City of Lawrence is sending to GLSD), there still appears to be some short fall between the amount of revenues obtained by the increased sewer rates and the likely treatment expenses that the City of Lawrence will incur. This is primarily due to the fact that the City of Lawrence directed the engineering/consulting firm of Whitman and Howard to construct a sewer rate to meet the projected city budget short fall for fiscal year 1993 of $609,000 and not to meet the projected expenses of waste water transportation and treatment. Nevertheless, whether there is a short fall or not, this court finds that the revenues obtained from the increased sewer rates do go to pay for the costs of sewage treatment and transportation.
Under the current City of Lawrence sewer rates, those users who discharge the highest amounts of waste water pay a large percentage of the city’s total cost of treating waste water. The commercial and industrial users who discharge in excess of 575 ccf per quarter, including the plaintiff, Merrimac Paper Co., contribute approximately 35.8% of the city’s total waste water. These commercial and industrial users, by paying the higher inverted block rate, pay approximately 47.8% of the entire cost of Lawrence’s sewage treatment. This having been said, it is also true the average large user of waste water discharges between 44 to 47% more waste water than the average small residential customer. All of this may prove Mark Twain’s observation about the worth of statistics. To focus solely on the plaintiff Merrimac, that company contributes 9% of the entire waste water flow for the City of Lawrence and pays approximately 13.7% of the ciiy’s entire waste water treatment costs.
There is no doubt that the plaintiff Merrimac Paper is a voluntaiy user of the ciiy’s sewer system. Merrimac could process and treat its own waste water and, pursuant to a permit obtained from the U.S. E.P.A. under the Clean Water Act, discharge that waste water legally to the Merrimac River. The plaintiff Merrimac Paper, however, has decided for economic reasons not do this. Instead, Merrimac Paper dumps its waste water into the City of Lawrence’s sewer and has it processed by GLSD. There is no evidence indicating that Merrimac’s plant could not house an in-house “pretreatment” facility or that such a pretreatment facility was not technologically practical. Of course, such a facility costs money and requires an economic sacrifice. But, industrial pretreatment is plainly a practical alternative to incurring municipal sewer charges.
Like other industrial contributors of waste water, Merrimac pays a surcharge to GLSD for treatment of its industrial waste. The treatment of industrial waste is more expensive than the treatment of normal household sanitary sewage. Therefore, GLSD directly assesses various industries a separate charge for the treatment of this more expensive industrial waste.
The GLSD treatment facility was built between 20 to 25 years ago when the construction of such facilities were heavily subsidized by the federal government pursuant to the Clean Water Act. The federal government no longer provides such generous subsidies. Such waste water treatment facilities have a useful life of thirty to fifty years. These treatment facilities are considered a resource that can be conserved. The less flow that goes into a waste water treatment plant, the longer that treatment plant can operate efficiently and below capacity. Treatment plants are built with a certain maximum capacity projection. The maximum capacity of GLSD is approximately fifty-two million gallons per day. GLSD has not yet met its capacity and is treating, on a day when in which a large amount of storm water is not present, approximately thirty-four million gallons per day.[5]
In the last year or two, the amount of waste water being contributed to the facility has decreased. Part of this is due to the fact that the GLSD has been successful in its ongoing effort to reduce the amount of infiltration and inflow.
One of the motivations that the City of Lawrence had when establishing the two-tier inverted block rate structure was to conserve the GLSD treatment resource. This conserving of the capacity and design life of the facility is to be accomplished by providing an incentive to reduce the amount of waste water discharged to the facility. The inducement is in the form of forcing people who contributed the largest amount of waste water (i.e. the users discharging an excess of 575 ccf per quarter) to pay a larger amount of money.
*363 Two-tier rate structures are not extraordinary. As previously noted, such a rate structure presently in effect in the Town of Methuen (although the second tier begins at 150 ccf as opposed to 575 ccf). In addition, the City of Lowell and apparently various towns within the South Essex Sewage treatment system also have two-tier rate structure.
Towns and cities throughout Massachusetts (not to mention the United States) have adopted a wide range of methods to establish sewer rates. The cities of Boston and Cambridge, for example, have established calibrated inverted block rate sewer rates. For example, the Cambridge rate begins with $2.84 for up to 40 ccf then jumps to $3.01 for volumes between 41 — 400 ccf and increasing to $3.24 for volumes between 401— 2000 ccf and then charging $3.49 for volumes above 2000 up to 10,000. The Town of Brookline (which may have little industry) is also a member of the same water resource authority (the Massachusetts Water Resources Authority) as Boston and Cambridge. Brook-line takes a different approach and charges a flat fee of $2.65 charge per ccf regardless of the amount of waste water discharge. Chelsea, again a member of MWRA, is a city considerably different than Brookline and has industrial base, but Chelsea still charges a flat uniform $3.28 per ccf. Indeed, numerous towns and cities within the Massachusetts Water Resource Authority jurisdiction (from Melrose to Lexington to Hingham) all take different approaches in setting sewer rates. See Exhibit 77. Cities outside the MWRA also show remarkable diversity in their method of establishing sewer rates. Some, like Brockton, use an inverted block rate while others, like Fall River, charge one rate to residential users of the séwers and a different, lower rate for commercial users of the sewers. Many (like Gloucester and Haverhill) charge a flat uniform rate. See Exhibit 77. Looking nationally, other cities take a different approach and charge a declining block rate. Take for example Houston Texas, which charges a rate of $5.55 per ccf for the first 3000 gallons but then reduces the charge for amounts in excess of3000 gallons to $3.09. St. Paul, Minnesota takes a similar approach. San Francisco, California, however, uses an inverted block rate charging $ 1.68 ccf for the first 600 ccf of waste water and hiking the rate to $4.22 for amounts over 600 ccf. See Exhibit 77. Obviously, cities and towns have adopted a wide variety of sewer rates in response to a wide variety of different circumstances and concerns.
DISCUSSION AND RULINGS OF LAW
The primary issue in this case is whether the City of Lawrence established a “just and equitable” annual waste water rate pursuant to M.G.L.c. 83, §16. There is little dispute that the monies received by the City of Lawrence through its new waste water rate structure have gone to pay the bills of the Greater Lawrence Sanitary District (GLSD) and for the maintenance of the city’s own sewage collection system. The plaintiffs, however, vigorously argue that the adopted two-tier rate is not “just and equitable.”[6]
The plaintiff relies heavily on the testimony of its impressive and well-qualified expert, William G. Stannard, a Public Engineer and senior partner at the consulting firm of Black & Veatch. Mr. Stannard has consulted on and assisted various cities in establishing waste water rate structures. He opined that the rate structure established by the City of Lawrence was one which did not follow generally accepted rate making and cost of service principles. He further offered the opinion that a municipality’s waste water fee structure is only fair and equitable if it reflects the city’s cost of providing waste water collection and treatment service to a particular customer. He concluded that the Lawrence waste water rate structure failed miserably in this regard in that it did not reflect, at least for the commercial and industrial users exceeding the quarterly 575 CCF limit, the city’s cost in providing waste water treatment to those customers. In addition, the Lawrence waste water rate system did not take into account (and attempt to apportion fairly) the considerable expense of treating infiltration and inflow. Mr. Stannard recommended that the cost of infiltration and inflow be allocated among all city users by a formula which assigned two-thirds of the cost in relation to the number of users and one-third to the amount of volume of waste water produced by a customer. Mr. Stannard further opined that the inverted block rate structure used by the City of Lawrence was not legitimate because such an inverted rate (which charges a greater amount for an increased amount of water volume) was best suited for a system that needed to conserve the amount of waste water due to a lack of capacity in the sewage treatment system. Mr. Stannard believed that the Greater Lawrence Sewage District presently possesses adequate capacity. Finally, Mr. Stannard testified that the Lawrence rate system was not a true “conservation rate” because it did not compel anybody but large commercial and industrial users to conserve waste water.
The expert offered by the City of Lawrence, a Mr. Kevin Gokin, is also a consultant to various cities and towns on waste water rate issues. He was employed by Whitman & Howard and was involved in the establishment of the City of Lawrence waste water rate structure. Mr. Gokin opined that the City of Lawrence waste water rate was proportional in that all users pay the same rate in the first tier and those users who utilize an excessive amount of waste water (i.e. the amounts in excess of 575 ccf per quarter) all pay the same higher rate. Mr. Gokin admitted that the rate structure was not established to reflect the cost of providing the service. Instead, Mr. Gokin testified that the rate structure was a sensible effort, which was part of a trend in various communities, to conserve water and to conserve and prolong the life of municipal sewage treatment facilities. Such a rate, Mr. Gokin explained, attempted to provide an incentive for *364 larger users to limit the amount of waste water discharged into the municipal system. Mr. Gokin noted that commercial and industrial users typically were better organized and situated and had a greater incentive to conserve water compared to individual residential customers.
Mr. Gokin did explain that he (and Whitman & Howard) initially recommended that Lawrence’s two-tier system be established in a somewhat different fashion. The initial recommendation was that all those users discharging an amount of water in excess of 575 ccf per year he charged the higher rate. Apparently in an attempt to limit the increased sewage rates to the largest commercial and industrial users, the city modified the initial Whitman & Howard proposal and set the tier limit at 575 ccf per quarter. This, of course, had the effect of imposing the higher second-tier rate on a smaller category of users.
Mr. Gokin admitted that most communities that have adopted a “conservation rate” (including various communities serviced by the Massachusetts Water Resources Authority) utilize an inverted block rate beginning at a much lower use level. For example, in Boston, and to a significantly lesser degree in Cambridge, the inverted block rate impacts even a small residential user encouraging that user to conserve waste water.[7]
Although interesting, some of the expert testimony misses the point. The only requirement in section 16 is that the rate be “just and equitable.” There is nothing in that statute that requires a municipality to base its waste water rate on the actual or estimated cost of service. Although it is undoubtedly good social policy to insure that the sewage rates produce sufficient income to pay for the costs of maintaining the waste water treatment plant, that simply is not a statutory mandate. Compare 33 U.S.C. §1251 et seq. (Federal Clean Water Act); 40 C.F.R. Pt. 35, subst. E, App. B(c) (regulations under Federal Clean Water Act — legislation that provides cities federal grants for construction of waste water treatment — attempt to ensure that sewer rates cover cost of running treatment plant and, thus, “promote self-sufficiency of treatment works with respect to operation and maintenance costs”). Cf. Robes v. Town of Hartford, 636 A.2d 342, 347-48 (Vt. 1993) (sewer rates need not be based on actual use of system to be deemed equitable so long as they are reasonably related to regulatory purpose); Robert Treat Associates v. Sewer Comm’n of City of Milford, 595 A.2d 858 (Ct. 1991) (city calculation of sewer charges based on methods other than use deemed reasonable). Instead, should a municipality decide to charge a sewer fee to sewer users it need only be ’’just and equitable" and the monies raised may be applied to paying the costs of the sewage treatment.[8] Likewise, it is unimportant what actually motivates a municipality to raise or alter its sewer rates — as long as the end result is a rate that is “just and equitable.” Any legislative body, municipal, state or federal, acts for diverse reasons — be it to placate the majority, or to raise badly needed revenue. The City Council’s motivations and goals have little bearing on this case. The subjective intent of a city council — even if it can be divined — is not the determinative factor; instead, what is important is the end result, Le. do the sewer rates represent a recovery for the cost of offering the service, rather than a general revenue raising device. Emerson College v. Boston, 391 Mass. 415, 424-25 (1984); Aiello v. Commissioner of the County of Dukes County, 35 Mass.App.Ct. 151, 152 (1993) .[9] Here the evidence is clear that the monies raised are necessary to pay for the GLSD assessments and related sewer costs. There is no credible evidence showing that the city used these funds for anything other than the cost of providing sewer service. The evidence also established that no funds in excess of sewer costs were raised by the increased rates.
Section 16 gives considerable discretion to a municipality in setting “just and equitable” sewer rates. Although the sewer charge “must be proportioned to the benefit [of the sewer] and not in excess of it,” the city may adopt any “reasonable way of estimating the extent of the benefit received.” Carson v. Brockton, 175 Mass. 242, 244 (1900) (Holmes, C.J.). The rate is only objectionable if it amounts to “the taking or destruction of property.” Id. At 245. As the United States Supreme Court stated in interpreting this same statute: “It was competent for the legislative power to assess the amount of benefit specially received ... so long as such amount is not grossly excessive, or out of all proportion to the benefit received particularly if connecting with the public sewer be left optional with the property owner.” Carson v. Brockton Sewage Commission, 182 U.S. 398, 403-04.
In “assess[ing] the amount of benefit specially received,” the city is entitled to paint with broad brush strokes particularly when it comes to an industrial customer, such as the plaintiff, who has made the voluntary economic decision to use the city’s sewer. Id. For example, given the fact that the equivalent of section 16 was enacted in 1892, one must doubt whether the intent of that section was to impose on a municipality a requirement to conduct a sophisticated and expensive “infiltration and inflow” analysis of the sewer system and then proportionally charge each of the users for the cost of that particular item. Likewise, given the very different methodology used by any number of cities in Massachusetts in setting their sewer rates, it seems impossible to interpret section 16 as requiring some sort of “generally accepted” or standardized approach to setting sewer rates. Section 16 appears to be best interpreted as providing each municipality considerable discretion to experiment with setting sewer rates to accomplish goals that may be unique to that area.
In this regard, there is no reason to prohibit Lawrence from adopting an inverted block rate even though the GLSD treatment plant may not have reached capacity. A municipaliiy has the flexibility to adopt a rate which will assist in conserving that resource. Likewise, a municipality could rationally make the decision (as testified *365 to by the city’s expert) that larger industrial users are more likely to conserve water than smaller residential users due to the fact that, in comparison, smaller residential users are less organized and do not have as large an economic stake (or obtain a sufficient payback) should waste water be reduced.[10]
This does not mean that a municipality can ignore the statutory mandate to provide “just and equitable” sewer charges. There must be credible evidence supporting the just and equitable nature of the charges. But as long as there is evidence that the rates indicate a reasonable attempt to balance the myriad concerns and costs of sewage treatment and a rational effort to roughly estimate the benefit received, the rate will be upheld. In other words, this court is not looking for the most proportional, sensible, or fairest rate. Instead, the court gives substantial deference to the democratically elected bodies that make the determination that the sewer rate adopted is just and equitable. Carson v. Sewage Commissions of Brockton, 175 Mass. at 244-45. See Handy v. City of Rutland, 598 A.2d 114, 118-19 (Vt. 1990); Elmwood v. Buffalo Sewer, 492 N.Y.S.2d 931, 934 (Ct.App. 1985).
Utilizing this standard of review, this Court concludes that the City of Lawrence’s two-tiered rate satisfies the requirements of being “just and equitable.” The largest dischargers of waste water in Lawrence undoubtedly pay, proportionately, a greater share of the costs of waste water treatment. But, the largest dischargers also burden the system more. Charging “in proportion to the extent of use ... is a reasonable way of estimating the extent benefit received.” Id.[11] See Fort Collins Motor Homes, Inc. v. City of Fort Collins, 496 P.2d 1079 (Colo.Ct.App. 1972) (classification system distinguishing between single residence and commercial approved); McGrath v. City of Manchester, 398 A.2d 842 (N.H. 1979) (residential/multi-family home classifications upheld, mathematical equality not necessary); Antlers Hotel v. Newcastle, 341 P.2d 951 (Wyo. 1951) (residential classifications). Even if one were to focus solely on Merrimac (which contributes 9% of the wastewater, but is charged 13.7% of the total treatment cost), the city need only base its rate in a roughly proportional fashion. An “overcharge” of 4.7% is not “grossly excessive.” Carson, supra, 182 U.S. at 403.
In addition, such a rate structure is just and equitable in its effort to conserve the amount of waste water discharged into a sewage treatment system. There is good reason to believe that a inverted block rate, even though it becomes effective only at a substantially high volume, will encourage the heaviest users of waste water to considerably reduce their flow. Such a reduction undoubtedly has a positive impact upon a city which is attempting to prolong the life of the treatment plant. Cf. Elmwood-Utica Houses v. Buffalo Sewer, supra (practice of exempting tax-exempt organizations from sewer surcharge upheld because it directly related to benefit received — increased property values); 33 U.S.C. §1251 et seq. (Clean Water Act provisions permitting reduction in sewer rates for low income homes, social policy sufficient to justify any resulting disproportionate rate). Choosing to conserve water by utilizing a two-tier inverted block rate is precisely the type of policy decision that a court should not attempt to second guess.
The fact that the cost of infiltration and inflow (a very substantial cost in this case) is determined according to volume (and not according to the number of users of the system) also appears equitable. For example, even the more specific and calibrated regulations of the federal Clean Water Act permit cities to recover the cost of infiltration and inflow based upon the volume of waste water discharged. Again, infiltration and inflow is addressed by different cities using a variety of formulas. See fn.2, infra. Plaintiffs expert candidly admitted that he suspected a number of cities did not address the issue of infiltration and inflow in setting their rates. The city’s decision to disburse the cost of infiltration and inflow according to the volume that each user discharges appears reasonable. It cannot be termed unjust or inequitable.
It is troublesome that the City of Lawrence ignored its consultant’s recommendation of setting the second tier at an annual rate of 575 ccf. Such a rate structure undoubtedly would conserve considerably more waste water and would have the increased benefit of more equitably dispersing the expense of waste water treatment. Indeed, the impact the City’s 575 ccf per quarter rate skates close to the line as being significantly disproportionate. Given the degree of latitude, however, provided to municipalities in setting their rates and experimenting with the most efficient ways to reduce or recover the costs of waste water treatment, this Court cannot conclude that the City of Lawrence rate is “grossly excessive, or out of all proportion to the benefit received ...” Carson v. Brockton Sewage Cornm'n, 182 U.S. at 403.
CONCLUSION
The plaintiff has not proved a violation of M.L.C.C. 83, §16. Judgment shall enter for the defendants.

The plaintiff presses both a constitutional claim (alleging an illegal tax and a lack of proportionality) and a daim pursuant to Chapter 83, §16. These claims appear (dressed in somewhat different garb) in counts one, two and three of Merrimac’s complaint. No matter how one captions the daim — be it an illegal tax, a violation of the constitutionality requirement, or a violation of M.G.L.c. 83, §16 — the matter reduces itself to whether the rate was just and equitable. See discussion, infra. The plaintiff also claimed (in Count Four) that the City of Lawrence violated its own ordinances in that the sewer rates yielded revenues in excess of the amount necessary to offset the cost of operating the sewers and treatment plant. This reasoning apparently has been abandoned. The plaintiffs own expert testified that the rates were defective because they did not yield revenues sufficient to offset the costs of operation. Count Four also claimed that Chapter 27B of the Lawrence Revised Ordinances did not permit a two-tiered rate. The user charge a system set forth in that chapter contemplates a rate *366 based on volume and is not as restrictive as the plaintiff claims. The ordinance reasonably encompasses the adopted two-tier rate structure. In its post-trial brief, the plaintiff belatedly claims that the new sewer fee violated separation of powers principles. This allegation appears nowhere in the complaint and the plaintiff never sought to amend the complaint. In any event, the Ciiy Council (with the Mayor’s concurrence) is permitted to establish a sewer rate.

Certain cities and towns utilize formulas in an attempt to assess the costs of treating infiltration and inflow. See, Exhibit 79 (Appendix C). These formulas vary widely. Some use a formula of % number of customers/[1]/^ volume produced. This is the formula recommended by plaintiffs expert. Some cities use a different percentage while others assess the cost of infiltration and inflow solely on the volume produced (see, e.g., Lawrence and Los Angeles) or the number of customers (see Baltimore and Washington). All of these methods appear rational. None appear to be more than rough guesses as to how to fairly allocate the cost of infiltration and inflow. As plaintiffs expert opined, many cities and towns may make no special effort to proportion the cost of infiltration and inflow.

The amount of the deficit that the City of Lawrence ran up with the GLSD cannot be exactly determined. Certainly by December21, 1993 there was a sewer deficit of approximately $593,000. See Exhibit 31. The deficit, perhaps including interest or late charges, is apparently referred to as the “1991 deferral and the 1992 deferral” in the Whitman and Howard reports. The 1991 deferral is $462,773; the 1992 deferral is $661,529. See Exhibit 3. In any event, the parties agree that the city had accumulated a significant debt to the GLSD. The parties also agreed during the hearing that this debt exceeded the $609,000 1992 budget short fall that motivated the city to adopt the current sewer rates. The parties also apparently agree (and the evidence establishes) that whatever the motivation of raising the Ci1y of Lawrence sewer rates, the increased revenue from the increased rates have been necessary to pay the past GLSD deficits, the continuing GLSD assessments, and the continuing costs of the City of Lawrence in maintaining their own sewer waste transportation system.

As can be seen, the Lawrence rate levels (i.e. $1.40 and $2.61) compare favorably with the rates charged by other GLSD members. Rate levels and the proportional impact of the rate structure may be two separate matters.

On days with a heavy storm flow, the GLSD plant does exceed capacity, resulting in inadequate treatment of the sewage. The less amount ofwaste water contributed, the more unlikely an overflow situation will occur. Given that Lawrence has a combined sewer system (which contributes storm water) it is difficult to determine whether GLSD is, for practical purposes, approaching its capacity limit.

The Ci1y also vigorously argues that the sewer rate violates Part II, c. 1, § 1, Art. 4 of the Massachusetts Constitution in that the rate is not “proportional and reasonable.” In many ways, the plaintiffs constitutional argument regarding proportionality merges with (and is subsumed by) its argument that the rate violates the “just and equitable” mandate of M.G.L.c. 83, §16. See Post Trial Brief of Merrimac Paper, pp. 13-17. As noted infra at 20-21, the Carson decision did interpret the phrase “just and equitable” to require that the sewer charge be proportioned to the benefit. At the same time, the legislative body can determine the benefit received (and, thus, the proportionality) in any “reasonable way.” In this manner, constitutional arguments of proportionaliiy are equivalent to the statutory arguments regarding the “just and equitable” standard. No purpose is served by separately analyzing these two equivalent arguments.
If one was to separately reach the plaintiffs constitutional argument, a serious issue exists as to whether the language of Article IV relates solely to tax assessments, tax rates, and taxes — and not to any type of rate or charge adopted by a legislative body.

As in the City of Lawrence, the waste water discharge of most residential and many commercial customers is not directly monitored. Instead, the City uses a meter to determine the amount of water taken from the public water supply by the customer and then uses that figure as the approximate amount of waste water discharged by that customer. Thus, the conservation of waste water is often directly related to the conservation of the public water supply.

For example, the fact that the Lawrence sewer rate has in the past (and may in the future) underfunded the cost of maintaining the sewers and paying GLSD annual assessments is irrelevant for the purposes of M.G.L.c. 83, §16 so long as the rate charged is just and equitable.

It is of importance that the plaintiff has a realistic alternative (i.e. in-house treatment of its industrial waste water) to the use of city’s sewers. The company’s decision to use the city’s sewers is entirely a voluntary one based on its own economic advantage.
This fact, taken together with the fact that the funds raised by the increased sewer charges are necessary to pay for sewage disposal and treatment, defeat the plaintiffs argument that the Lawrence sewer fee is actually an illegal tax. As the Supreme Judicial Court stressed in Emerson College v. Boston, 391 Mass. 415, 524-25 (1984), fees are distinguishable from taxes in that a fee: 1) charges for a particular service that all citizens do not necessarily receive; 2) incurring the fee is a voluntary choice; and 3) the charges represent a recovery for the cost of offering the service. See Aiello v. Commissioners of the County of Dukes County, 35 Mass.App.Ct. 151, 152 (1993). All three elements are satisfied in this case.

The Massachusetts legislature also sees the conservation benefit of increasing block rates. See M.G.L.c. 165, §2B (requiring MWRA communities to adopt increasing block water rates); MCLE 40, §39L (prohibiting all communities from adopting decreasing block water or sewer rates).

Even if Lawrence explicitly charged an “industrial” rate which was higher than the “residential” rate, such a rate might still be just and equitable because the content and nature of the industrial waste — not just the volume of flow— may well burden the city collection system more than normal residential sewage or storm water. Likewise, industries may have a greater economic incentive to conserve resources — or, at least, possess a more comprehensive, organized ability to conserve. Finally, industries may well possess a greater ability to choose whether to use the sewer or install its own treatment system.